**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X         **FOR PUBLICATION**

In re:                                                                Chapter 11

WB BRIDGE HOTEL LLC and                                               Case No. 20-23288 (SHL) and
159 BROADWAY MEMBER LLC**,**                                          Case No. 20-23289 (SHL)


                                                                      (Jointly Administered)

                                        Debtors.
-----------------------------------------------------------X
NAT WASSERSTEIN, AS TRUSTEE OF THE
WB BRIDGE CREDITOR TRUST
                                        Plaintiff,

              v.                                                      Adv. Pro. No. 22-07059 (SHL)

11 APPLE LLC *et al.*,

                                        Defendants.
-----------------------------------------------------------X

<u>**MEMORANDUM OF DECISION**</u>

**A P P E A R A N C E S :**

**LEECH TISHMAN ROBINSON BROG, PLLC**
*Counsel to the WB Bridge Hotel LLC and*
*159 Broadway Member LLC*
875 Third Avenue, 9th Floor
New York, New York 10002
By:    Fred B. Ringel, Esq.
          William A. Rome, Esq.
          Steven B. Eichel, Esq.

**SILVERMANACAMPORA**
*Counsel to Nat Wasserstein, the Trustee*
*of the WB Bridge Creditor Trust*
100 Jericho Quadrangle, Suite 300
Jericho, New York 11753
By:    David J. Mahoney, Esq.

**WILLIAM K. HARRINGTON**
*United States Trustee for Region 2*
Alexander Hamilton Customs House
One Bowling Green, Room 534
New York, New York 10004
By:    Andrea B. Schwartz, Esq.

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court is the question of whether a law firm that represented the Debtors in these Chapter 11 cases—up through and including confirmation—may now withdraw from that representation to represent the individual who managed the Debtors and who now is being sued by the trustee liquidating the Debtors' estates. This issue is raised in two pending motions. In the first motion, the law firm of Leech Tishman Robinson Brog, PLLC ("LTRB") filed the Motion to Withdraw as Counsel to the Post-Confirmation Debtors, WB Bridge Hotel LLC and 159 Broadway Member LLC. *See* ECF No. 190, Case No. 20-23288 (the "Withdrawal Motion"). Nat Wasserstein, the Trustee of the WB Bridge Creditor Trust ("Trustee") filed an objection to the Withdrawal Motion [ECF No. 192, Case No. 20-23288] (the "Withdrawal Opp.") and LTRB filed a response to the objection [ECF No. 198, Case No. 20-23288] (the "Withdrawal Reply"). In the second motion, the Trustee seeks to disqualify LTRB from representing that individual—and some of his entities—in an adversary proceeding filed by the Trustee, *Wasserstein v. 11 Apple LLC et. al*, Adv. Pro. No. 22-07059 (the "Adversary Pro."). *See* ECF No. 14, Adv. Pro. No.22-07059 (the "Disqualification Motion"). LTRB objected to the Disqualification Motion, [ECF No. 29, Adv. Pro. 22-07059] (the "Disqualification Opp.") and the Trustee filed a reply. [ECF No. 31, Adv. Pro. No. 22-07059] (the "Disqualification Reply").

The Court concludes that, while LTRB may withdraw from its representation of the Debtors in the main bankruptcy proceeding, it is ethically barred from its proposed representation of the defendants in the Adversary Proceeding as these matters substantially overlap with LTRB's prior representation of the Debtors. Accordingly, both the Withdrawal Motion and the Disqualification Motion are granted.

## BACKGROUND

In late 2020, WB Bridge Hotel LLC ("WB Bridge") and 159 Broadway Member LLC ("159 Broadway," and together with WB Bridge, the "Debtors") filed voluntary petitions under Chapter 11 of the Bankruptcy Code. *See* ECF No. 1, Case No. 20-23288; ECF No. 1, Case No. 23289.[1]  The Debtors' cases were jointly administered for procedural purposes only.  *See* Order Directing Joint Administration of Chapter 11 Cases and Related Relief [ECF No. 12, Case No. 20-23288].  At the time of filing, Debtor 159 Broadway owned 100% of the membership interests in Debtor WB Bridge, and WB Bridge owned real property located at 159 Broadway, Brooklyn, New York.  Declaration Pursuant to Local Rule 1007-2 ¶ 3 [ECF No. 20, Case No. 20-23288].  The Debtors were in the process of developing the real property owned by WB Bridge into a hotel but were unable to consensually restructure existing financial obligations.  *Id.* ¶¶ 3, 4.  When the secured lender of 159 Broadway scheduled a UCC sale of 159 Broadway's membership interests in WB Bridge, *id.* ¶ 4, the Debtors commenced these Chapter 11 cases "to preserve the assets of the Debtors for the benefit of their creditors and their estates."  *Id.*  Fred Ringel from the law firm of Robinson Brog Leinwand Greene Genovese & Gluck P.C. ("Robinson Brog") signed the bankruptcy petition of both WB Bridge and 159 Broadway as attorney for the Debtors.  *See* ECF No. 1, Case No. 20-23288; ECF No. 1, Case No. 20-23289.

Consistent with Section 521(a)(1)(B) of the Bankruptcy Code, the Debtors filed schedules of assets and liabilities as well as statements of financial affairs ("SOFAs") shortly after commencing the cases.  *See* ECF No. 19, Case No. 20-23288 (the "159 Broadway SOFA"); ECF No. 18, Case No. 20-23288 (the "WB Bridge SOFA").  In these filings, the Debtors listed,

---

[1]    It is well settled that a court may take judicial notice of documents filed on the court's docket.  *See Teamsters Nat'l Freight Indus. Negotiating Comm. v. Howard's Express, Inc. (In re Howard's Exp., Inc.)*, 151 F. App'x 46, 48 (2d Cir. 2005).

among other things, the Debtors' property as well as their creditors. In the SOFAs, the Debtors

also identified their equity holders and answered certain questions about financial transactions.

*Id.* Specifically, the 159 Broadway SOFA stated that Cornell 159 LLC owned 93.75% of the

equity of 159 Broadway, and that Yitzchok Hager ("Mr. Hager") was the manager of 159

Broadway. *See* 159 Broadway SOFA. The Debtors' SOFAs also listed pre-petition transfers to

insiders that occurred within one year of the petition date. *See, e.g., id.* Part 2 (identifying a

payment of $238,000 to Cornell Realty Holdings LLC as a "reimbursement").

At the start of these cases, the Debtors filed an application to retain Robinson Brog as

counsel. *See* Amended Debtors' Application for Authorization to Retain Counsel [ECF No. 43,

Case No. 20-23288] (the "Robinson Brog Retention Application"). The services to be provided

by Robinson Brog included, *inter alia,* "providing advice to the Debtors with respect to their

powers and duties under the Bankruptcy Code in the continued operation of their business and

the management of their property" and "assisting the Debtors in connection with all aspects of

these [C]hapter 11 cases." *Id.* ¶ 11. In support of the application, Mr. Hager submitted a

declaration stating that Cornell Realty Holdings LLC—of which Mr. Hager is the managing

member—had paid $10,000 to Robinson Brog on behalf of the Debtors in connection with

Robinson Brog's representation of the Debtors. *See* Amended Declaration of Isaac Hager ¶¶ 1-2

[ECF No. 43-3, Case No. 20-23288]. Mr. Hager further stated that he understood that Robinson

Brog would only act as counsel to the Debtors in the bankruptcy case and that Robinson Brog's

fiduciary duty was to the Debtors. *Id.* ¶ 4. In further support of the application, the Debtors filed

an Amended Declaration of Fred Ringel [ECF No. 43-4, Case No. 20-23288] (the "Ringel

Declaration"), wherein Mr. Ringel—a shareholder at Robinson Brog—affirmed that Robinson

Brog does not represent any interest adverse to the Debtors and that Robinson Brog is a

4

disinterested party as defined in Section 101(14) of the Bankruptcy Code.[2]  Ringel Declaration ¶

7.  The Court granted the Robinson Brog Retention Application.  *See* ECF No. 49, Case No. 20-

23288.

Though Mr. Hager is not an equity holder of 159 Broadway, he appears to be in control

of the Debtors through other entities.  For example, the Debtors' books and records are held by

Cornell Realty Management LLC, which has the same address that Mr. Hager lists for his

address as manager of 159 Broadway.  *See* 159 Broadway SOFA at Part 13, questions 26c.1, 28.

Mr. Hager is also a co-obligor on 159 Broadway's secured debt.  *See* Bankruptcy Petition,

Schedule H [ECF No. 19, Case No. 20-23288].  Finally, Cornell Realty Holdings LLC paid the

retainer to Debtors' counsel, with Mr. Hager being the manager of Cornell who submitted the

declaration in connection with the Robinson Brog Retention Application.

After Robinson Brog's retention, the Debtors filed an Application for an Order

Authorizing Employment and Retention of Leech Tishman Robinson Brog PLLC as Substitute

Bankruptcy Counsel to the Debtors Effective as of May 15, 2022 [ECF No. 139, Case No. 20-

23288] (the "LTRB Retention Application.").  The LTRB Retention Application was prompted

by Robinson Brog combining its practice with the firm Leech Tishman Fuscaldo & Lampl, LLC,

with the resulting firm practicing under the name Leech Tishman Robinson Brog PLLC.[3]  LTRB

Retention Application ¶ 3.  The same team of attorneys continued to represent the Debtors

despite the change in firm name.  *Id.* ¶ 10.  The LTRB Retention Application stated that LTRB

would render services to the Debtors that included "providing advice to the Debtors with respect

---

[2]      A "disinterested party" under the Bankruptcy Code is a party that "(A) is not a creditor, an equity security
holder, or an insider; (B) is not and was not, within 2 years before the date of the filing of the petition, a director,
officer, or employee of the debtor; and (C) does not have an interest materially adverse to the interest of the estate or
of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection
with, or interest in, the debtor, or for any other reason."  11 U.S.C. § 101(14).

[3]      Robinson Brog ceased to practice law after the consolidation.  LTRB Retention Application ¶ 3.

to its powers and duties under the Bankruptcy Code in the continued operation of their business and the management of their property" and "assisting the Debtors in connection with all aspects of these Chapter 11 cases." *Id.* ¶ 11. The LTRB Retention Application was granted. *See* ECF No. 150, Case No. 20-23288.

Ultimately, the Court confirmed a plan of reorganization that had been proposed by the secured creditor, 159 Broadway 1 LLC. *See* 159 Broadway 1 LLC's First Amended Plan of Liquidation [ECF No. 129, Case No. 20-23288] (the "Plan"); Order Confirming 159 Broadway 1 LLC's First Amended Chapter 11 Plan of Liquidation for the Debtor [ECF No. 160, Case No. 20-23288] (the "Confirmation Order"). The Plan provided, *inter alia,* that the property owned by WB Bridges would be sold and the proceeds from the sale distributed to creditors. *See* Plan § 6.1. The Plan also provided for the creation of a liquidating trust (the "WB Creditor Trust") for the benefit of Debtors' creditors and interest holders, with the WB Creditor Trust taking title to any claims or causes of actions, other than claims directly related to the property to be sold. Plan §§ 6.5, 7.1, 7.3. The Confirmation Order designated Nat Wasserstein as Trustee and the Trustee was vested with the "duty and authority" to maximize the value of these transferred claims. *Id.* § 7.5; Confirmation Order ¶ 21. The Plan became effective on November 16, 2022. *See* Notice of Effective Date of Plan [ECF No. 178, Case No. 20-23288].

After his appointment, the Trustee commenced a number of adversary proceedings to recover Debtors' interests in property that were allegedly fraudulently conveyed prior to the Debtors' bankruptcy. *See* ECF No. 180-189, Case No. 20-23288. Of particular relevance to the pending motions, the Trustee commenced the Adversary Proceeding against Mr. Hager and forty-six corporate entities (the "Entity Defendants" and, together with Mr. Hager, the "Adversary Defendants") seeking to recover transfers under Sections 544(b), 548, and 550 of the

6

Bankruptcy Code as well as N.Y. D.C.L §§ 273-276. *See generally* Complaint [ECF 1, Adv.

Pro. No. 22-07059]. The Entity Defendants include, *inter alia,* Cornell 159 LLC, the majority

owner of WB Bridge. *Id.* Mr. Hager is alleged to own and/or control and/or exercise dominion

over each of the Entity Defendants, as well as the Debtors. Complaint ¶ 64. The Complaint

generally alleges that the Adversary Defendants were recipients or beneficiaries of property that

was fraudulently conveyed away from the Debtors and that the Debtors did not receive fair

consideration or reasonably equivalent value for the property or interest conveyed. *Id.* The

Trustee alleges that these transfers reduced the assets of the Debtors that may otherwise have

been available to pay creditors. The Complaint further alleges that Mr. Hager caused the

Debtors to transfer its interests in property for the benefit of the Adversary Defendants, and that

the Entity Defendants did not recognize corporate formalities, as funds were regularly transferred

between the Entity Defendants.[4] *Id.* ¶¶ 63-66, 69.

In early 2023, LTRB filed a motion to dismiss the Complaint in the Adversary

Proceeding on behalf of Mr. Hager and 41 of the 46 Entity Defendants.[5] *See* Defendants'

Memorandum of Law in Support of Motion to Dismiss Complaint [ECF No. 6, Adv. Pro. No.

22-07059]. At the time this motion to dismiss was filed, LTRB still represented the Debtors.

Five days after LTRB filed the motion to dismiss, the Trustee requested that LTRB

withdraw as counsel to the Adversary Defendants and withdraw the motion to dismiss. *See*

Withdrawal Motion, Exhibit C. In early 2023, LTRB filed its Withdrawal Motion seeking

---

[4] The Court notes that the defendants in the Adversary Proceeding whom LTRB seeks to represent list as their address 75 Huntington Street, Brooklyn New York—the same address used by Mr. Hager and the entity that holds the Debtors' books and records. *See generally* Complaint.

[5] LTRB does not represent four of the Defendants in the Adversary Proceeding; these include 159 Broadway 1 LLC (the Debtors' secured lender and the Plan proponent), 159 Broadway Mezz LLC (the Debtors' Mezzanine Lender) and two parties whose relationship to the Debtors is unknown. *See* Withdrawal Motion at 5, n. 2.

instead to withdraw as counsel to the Debtors, and the Trustee responded by seeking LTRB's disqualification in the Adversary Proceeding.  The Debtors subsequently filed a notice to substitute Shafferman & Feldman, LLP as counsel to replace LTRB.  *See* ECF No. 194, Case No. 20-23288 (the "Consent to Change Attorney").[6]

In the spring of 2023, the Court held a hearing on both the Withdrawal Motion and the Disqualification Motion.  *See* Hr'g Tr. (March 23, 2023) [ECF No. 33, Adv. Pro. No. 22-7059]. At the hearing, the Court invited the United States Trustee (the "UST") to weigh in on the retention dispute.  *Id.* at 70:5-72:1.  After the hearing, the UST filed a letter supporting the disqualification of LTRB but taking no position on LTRB's Withdrawal Motion.  *See* ECF No. 204, Case No. 20-23288 (the "UST Letter").  LTRB promptly responded to the UST Letter.  *See* Letter of Leech Tishman Robinson Brog, PLLC, dated May 2, 2023 [ECF No. 205, Case No. 20-23288].  With both motions fully briefed, the Court took the matter under advisement.

## DISCUSSION

### I.    Withdrawal Motion

In this Court, "[a]n attorney who has appeared as attorney of record may withdraw or be replaced only by order of the Court for cause shown."  Bankr. S.D.N.Y. R. 2090-1(e); *see also* S.D.N.Y. R. 1.4 (an attorney of record may be relieved or displaced only by order of the Court upon a showing by affidavit or otherwise of satisfactory reasons for withdrawal).  "Whether cause exists to grant a motion to withdraw as counsel is in the discretion of the trial court."  *In re Wiener*, 2019 Bankr. LEXIS 1893, at *8 (Bankr. S.D.N.Y. June 21, 2019) (citing *Stair v.*

---

[6]    Additionally, 159 Broadway Member LLC and Cornell 159 LLC—two defendants in the Adversary Proceeding (one of whom holds the majority of the equity in 159 Broadway)—filed a substitution of counsel in the Adversary Proceeding, with LTRB being removed as counsel to those two entities in favor of a different firm.  *See* Substitution of Counsel [ECF No. 28, Adv. Pro. No. 22-07059].  Meltzer, Lippe, Goldstein & Breitstone, LLP now represents Cornell 159 LLC and 159 Broadway in this Adversary Proceeding.  *See* Notice of Appearance [ECF No. 27, Adv. Pro. No. 22-07059].

8

*Calhoun*, 722 F. Supp. 2d 258, 264 (E.D.N.Y. 2010)); *cf. Hunkins v. Lake Placid Vacation Corp.*, 120 A.D.2d 199, 201 (App. Div. 3d Dep't 1986).  "In exercising that discretion, the court must consider (i) the reasons for withdrawal and (ii) the impact of the withdrawal on the timing of the proceeding." *Weiner*, 2019 Bankr. LEXIS 1893, at *8; *accord Farmer v. Hyde Your Eyes Optical, Inc*., 60 F. Supp. 3d 441, 444 (S.D.N.Y. 2014).  An application for withdrawal must be supported by an affidavit and a showing of satisfactory reasons "sufficient to constitute cause for withdrawal." *Goldstein v. Albert* (*In re Albert*), 277 B.R. 38, 45 (Bankr. S.D.N.Y. 2002).

Reasons for withdrawal can include "a client's lack of cooperation, including lack of communication with counsel, and the existence of irreconcilable conflict between attorney and client." *Farmer,* 60 F. Supp. 3d at 445 (quoting *Naguib v. Pub. Health Solutions*, 2014 WL 2002824, at *1 (E.D.N.Y. May 15, 2014)).  Nonpayment of fees can also constitute a basis for dismissal.  *See Stair*, 722 F. Supp. at 264; *but see Albert,* 277 B.R. at 50 ("Non-payment of legal fees, without more, is not usually a sufficient basis to permit an attorney to withdraw from representation").  A client's decision to discharge an attorney is also a basis to withdraw.  "When a client discharges a firm from its employment, and the firm accepts such discharge, the court should grant a motion to withdraw 'except under the most compelling circumstances.'" *Weiner*, 2019 Bankr. LEXIS 1893, at *10 (quoting *Figueroa v. City of New York*, 2017 U.S. Dist. LEXIS 186560 at *1 (E.D.N.Y. Nov. 9, 2017)).

In considering withdrawal, courts must also evaluate whether "the client's rights will be prejudiced by the delay necessitated in obtaining replacement counsel or [if] the court's trial calendar will be adversely affected." *Wiener¸* 2019 Bankr. LEXIS 1893, at *16 (quoting *Welch v. Niagara Falls Gazette*, 2000 U.S. Dist. LEXIS 16982, at *3 (W.D.N.Y. Nov. 17, 2000); *see also Honeedew Investing LLC v. Abadi*, 2022 WL 16857354, at *4 (S.D.N.Y. Oct. 3, 2022).

9

Courts are more likely to deny a motion to withdraw when a case is on the eve of trial but less likely to find prejudice to a client if discovery is still ongoing. *Id.; see also Karimian v. Time Equities, Inc*., 2011 WL 1900092, at *3 (S.D.N.Y. May 11, 2011).

Applying these principles here, the Court finds that cause exists to allow LTRB to withdraw. The Debtors have discharged LTRB as their counsel. *See* Consent to Change Attorney; *see also* Hr'g Tr. 23:24-24:8 (March 23, 2023) (counsel for LTRB representing to the Court that LTRB had a telephone conversation with the Debtors where the Debtors informed LTRB that the Debtors were discharging LTRB and hiring new counsel). "Courts in this District have consistently found that a client's discharge of an attorney is a sufficient basis for an attorney to withdraw as counsel." *Honeedew Investing* 2022 WL 16857354, at *3; *accord Weiner,* 2019 Bankr LEXIS 1893, at *10. Accordingly, cause exists to discharge LTRB.

The Court also finds that the Debtors will not be prejudiced by the withdrawal, and the withdrawal will not cause any delay or adversely impact proceedings going forward.[7] It is clear that this motion was motivated by the concern of LRTB's simultaneous representation of the Debtors and Adversary Defendants. *See* Withdrawal Motion ¶¶ 4, 22. While the Trustee initially opposed the Withdrawal Motion, *see* Withdrawal Opp. ¶¶ 14-21, the Trustee's concerns focused on LTRB's representation of the Adversary Defendants, rather than LTRB's continued representation of the Debtors. *Id.* During the hearing on the Motion to Withdraw, the Trustee was unable to point to any prejudice that would result from the termination of LTRB's representation of the Debtors other than a possible inability to obtain the Debtors' records; upon being assured that all of the Debtors' files had been passed to Debtors' new counsel, the Trustee

---

[7]      LTRB asserts that it may withdraw as counsel to the Debtors without leave of the Court, a position the UST vigorously disputes. *See* Withdrawal Motion ¶ 5; Reply to Withdrawal Motion ¶ 14; *see also* UST Letter at 1-2. As LTRB's Withdrawal Motion is presently before the Court, the Court assumes that LTRB recognizes the need to seek Court approval when withdrawal is disputed, as is the case here.

appeared to concede that there was no basis to object to withdrawal.  In fact, little—if any—work remains to be performed on behalf of the Debtors, as this case has already been confirmed and the real estate sold that constituted the majority, if not the entirety, of the bankruptcy estate.  *See* Confirmation Order; Notice of Effective Date of Plan; *see also* Hr'g Tr. 39:8-42:24 (March 23, 2023).[8]

## II.   Disqualification Motion

### A.   The Applicable Standard

Federal courts' power to disqualify attorneys "derives from their inherent power to 'preserve the integrity of the adversary process.'"  *Hempstead Video, Inc. v. Inc. Vill. of Valley Stream*, 409 F.3d 127, 132 (2d Cir. 2005) (quoting *Bd. of Educ. v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir. 1979)).  When exercising power to disqualify counsel, courts must balance "'a client's right freely to choose his counsel' against 'the need to maintain the highest standards of the profession.'"  *Id.* (quoting *Gov't of India v. Cook Indus., Inc.*, 569 F.2d 737, 739 (2d Cir.1978)).  In deciding a motion to disqualify, "courts often seek guidance from the American Bar Association (ABA) and state disciplinary rules, though 'such rules merely provide general guidance and not every violation of a disciplinary rule will necessarily lead to disqualification.'"  *James E. Zalewski, Draftics, Ltd. v. Shelroc Homes, LLC*, 2012 U.S. Dist. LEXIS 11608, at *10 (N.D.N.Y. Jan. 31, 2012) (quoting *Hempstead Video,* 409 F.3d at 132-33 (2d Cir. 2005)).

Motions to disqualify "are generally disfavored, and the movant carries 'a heavy burden and must satisfy a high standard of proof.'"  *Nisselson v. Empyrean Investment Fund, LP (In re MarketXT Holdings Corp.)*, 2005 WL 3789407, at *3 (Bankr. S.D.N.Y. Apr. 20, 2005) (quoting *Felix v. Balkin*, 49 F. Supp. 2d 260, 267 (S.D.N.Y.1999)); *accord Bell v. Rochester Gas & Elec.*

---

[8]      The UST took no position on whether the Court should grant the withdrawal motion.  *See* UST Letter at 1.

*Corp.*, 2004 U.S. Dist. LEXIS 14343, at *4 (W.D.N.Y. July 20, 2004).  Courts are skeptical of

motions to disqualify because the motions "are 'often interposed for tactical reasons' and result

in unnecessary delay."  *Bennett Silvershein Assoc. v Furman*, 776 F. Supp. 800, 802 (S.D.N.Y.

1991) (quoting *U. S. Football League v. Nat'l Football League*, 605 F. Supp. 1448, 1452

(S.D.N.Y.1985)); *see also Employers Ins. Co. of Wausau v. Munich Reinsurance Am., Inc*., 2011

WL 1873123, at *4 (S.D.N.Y. May 16, 2011) (a trial court "should be mindful that a

disqualification motion might be used as tactical device to delay a case,  and impose upon an

adversary the costs of defending an issue collateral to the merits of a case").  Nevertheless,

"doubts should be resolved in favor of disqualification."  *Bennett Silvershein*, 776 F. Supp. at

802.; *see also MarketXT Holdings*, 2005 WL 3789407, at *3.  Whether to disqualify counsel is

"subject to the trial court's sound discretion."  *Blue Cross & Blue Shield of New Jersey v. Philip

Morris, Inc*., 53 F. Supp. 2d 338, 342 (E.D.N.Y. 1999) (citing *Cresswell v. Sullivan & Cromwell*,

922 F.2d 60, 72 (2d Cir.1990)); *accord Hull v. Celanese Corp.,* 513 F.2d 568, 571 (2d Cir.

1975).

When considering a motion to disqualify counsel based on a conflict of interest, courts

consider the timing of the representation.  Said another way, courts examine whether counsel

seeks to engage in concurrent representation of adverse parties or if the current representation of

a party is subsequent to the representation of the party to whom the current client is adverse.

*Hempstead Video*, 409 F.3d at 133.  For concurrent representation, it is "'prima facie improper'

for an attorney to simultaneously represent a client and another party with interests directly

adverse to that client."  *Id.* (quoting *Cinema 5, Ltd. v. Cinerama, Inc.,* 528 F.2d 1384, 1387 (2d

Cir.1976)).  Thus, disqualification of counsel is the likely result for concurrent representation of

two adverse parties, unless there is a showing that "at the very least, that there will be no actual

or *apparent* conflict in loyalties or diminution in the vigor of his representation." *Id.* (emphasis

in original). "This burden is 'so heavy that it will rarely be met.'" *Pergament v. Ladak*, 2013

WL 3810188, at *4 (E.D.N.Y. July 23, 2013) (quoting *GSI Com. Sols., Inc. v. BabyCenter,*

*L.L.C.*, 618 F.3d 204, 209 (2d Cir. 2010)).

> For successive representation, an attorney may be subject to disqualification if:
>
> (1) the moving party is a former client of the adverse party's counsel;
>
> (2) there is a substantial relationship between the subject matter of the counsel's prior representation of the moving party and the issues in the present lawsuit; and
>
> (3) the attorney whose disqualification is sought had access to, or was likely to have had access to, relevant privileged information in the course of his prior representation of the client.

*Hempstead Video,* 409 F.3d at 133 (citing *Evans v. Artek Sys. Corp.,* 715 F.2d 788, 791 (2d Cir.

1983)). The New York State Rules of Professional Conduct echo the three elements needed to

subject a lawyer to disqualification. The Rules provide that "a lawyer who has formerly

represented a client in a matter shall not thereafter represent another person in the same or a

substantially related matter in which that person's interests are materially adverse to the interests

of the former client unless the former client gives informed consent, confirmed in writing." *See*

N.Y. Prof'l Rule 1.9.

For matters to be substantially related, the issues have to be "identical" or "essentially the

same." *Streichert v Town of Chester*, 2021 U.S. Dist. LEXIS 35468, at *36 (S.D.N.Y. Feb. 25,

2021); *In re I Successor Corp.*, 321 B.R. 640, 658 (Bankr. S.D.N.Y. 2005). While "[t]he Second

Circuit has not provided definitive guidelines on what issues in the past and current actions must

be 'identical' or 'essentially the same,' [ ] the relevant inquiry extends beyond 'whether there are

common legal claims or theories (. . .) to whether there are common factual issues that are

material to the adjudication of the prior and current representations.'" *Ladak*, 2013 WL

3810188, at *3 (quoting *Mitchell v. Metropolitan Life Ins. Co., Inc.*, 2002 WL 441194, at *8

(S.D.N.Y. 2002)).  Nevertheless, "disqualification may be appropriate when the two matters are

merely similar [if] 'disqualification is predicated on the extensiveness of the attorney's exposure

during the prior representation to particular practices that are similar to those underlying the

subsequent litigation.'" *In re I Successor Corp.*, 321 B.R. at 658 (quoting *Bennett Silvershein*,

776 F. Supp. at 804).

Regarding the third prong, access to confidential information is presumed if there is a

substantial relationship between the former and current representation.  *Hull*, 513 F.2d at 572;

*accord Employers Ins. Co. of Wausau*, 2011 WL 1873123, at *5 ("When the prior matter

involved litigation, it will be conclusively presumed that the lawyer obtained confidential

information about the issues involved in the litigation.") (internal citation omitted).  Such a

presumption is necessary to avoid requiring a client to "tear aside the protective cloak drawn

about the lawyer-client relationship." *In re I Successor Corp.*, 321 B.R. at 648 (quoting *T. C.

Theatre Corp. v. Warner Bros. Pictures*, 113 F. Supp. 265, 269 (S.D.N.Y. 1953)).

However, disqualification is not warranted simply based on a finding that all three

elements required to show an adverse representation of a former client are present.  *See In re

Corp. Res. Servs., Inc*., 595 B.R. 434, 442 (S.D.N.Y. 2019) (holding that a violation of

disciplinary rules does not necessarily result in disqualification).  Rather, "the Second Circuit has

made clear that disqualification is appropriate, at least in most cases, only if a violation of the

Code of Professional Responsibility gives rise to 'a significant risk of trial taint.'" *Pfizer v.

Stryker Corp.*, 256 F. Supp. 2d 224, 226 (S.D.N.Y. 2003) (quoting *Glueck v. Jonathan Logan,

Inc*., 653 F.2d 746, 748 (2d Cir. 1981)); *see Hempstead Video*, 409 F.3d at 132

("[D]isqualification is only warranted where an attorney's conduct tends to taint the underlying

14

trial.") (internal citations and quotations omitted); *see also Am. Int'l Grp., Inc. v. Bank of Am. Corp.*, 827 F. Supp. 2d 341, 345 (S.D.N.Y. 2011).

    B.    <u>Disqualification Here</u>

    The Court must first determine whether LTRB's representation of both the Debtors and the Adversary Defendants was concurrent or successive. One can argue that LTRB should be subject to the standard for concurrent representation. In fact, LTRB represented both the Debtors and the Adversary Defendants for a short period of time. LTRB noted its appearance on behalf of the Adversary Defendants on January 20, 2023, but LTRB did not file its Motion to Withdraw until January 30, 2023 and the Consent to Change Attorney wasn't filed for another six days. Despite this overlap—during which LTRB filed a motion to dismiss on behalf of the Adversary Defendants—there is authority that a law firm can avoid the more stringent rules of concurrent representation by belatedly seeking withdrawal of one representation if the standards for withdrawal are met. *See Pereira v. Allboro Building Maintenance, Inc. (In re Allboro Waterproofing Corp.)*, 224 B.R. 286, 289 (Bankr. E.D.N.Y. 1998); *see also Peterson v. Sanches (In re Mack Indus., Ltd.)*, 606 B.R. 313, 316 (Bankr. N.D. Ill. 2019); *but see In re I Successor Corp.*, 321 B.R. at 649 (rejecting the assertion that a lawyer has no duty of loyalty to a former client); *Schwed v. Gen. Elec. Co.*, 990 F. Supp. 113, 115 (N.D.N.Y. 1998) (finding that an attorney can be constrained from representing a party whose interests are adverse to a former client because of a continuing duty of loyalty to the former client). Given that the Court has found that LTRB satisfies the requirements for withdrawal here and that its brief period of dual representation did not result in any prejudice to either of its clients, the Court will apply the rules for successive representation. But the Court strongly counsels LTRB against such a lax

approach in the future on this important issue. Analyzing LTRB's representation as successive then, the Court turns to evaluating each of the prongs of the three part test.

1. Whether the Moving Party is a Former Client of the Adverse Party's Counsel

As to the first prong, the question is whether the Trustee qualifies as a former client of LTRB by virtue of LTRB's representation of the Debtors. *See Hempstead Video*, 409 F.3d at 133 (stating that the moving party must show that the moving party is a former client of the adverse party's counsel). While LTRB contends that the Trustee does not qualify as LTRB's former client, the Trustee and the UST disagree. *See* Disqualification Opp. ¶ 20; *but see* Disqualification Motion ¶ 22; UST Letter at 3. Based on the record here, the Court finds that the Trustee is a former client of LTRB.

It is well settled that a "[t]rustee steps into the shoes of the debtor for the purpose of bringing property into the bankruptcy estate." *Picard v. JPMorgan Chase & Co.*, 460 B.R. 84, 91 (S.D.N.Y. 2011), *aff'd sub nom. In re Bernard L. Madoff Inv. Sec. LLC*, 721 F.3d 54 (2d Cir. 2013). Of significance here, the Plan specifically provides that "any Privilege of the Debtors' shall be transferred to the Creditor Trust and shall vest in the Creditor Trustee and its representatives," with "privilege" specifically defined to include attorney-client privilege. *See* Plan §§ 7.3(b), 1.67. As the court in *I Successor Corp.* concluded, this transfer of privilege renders the Trustee LTRB's former client. "The fact that [the debtor] changed its name to [a different entity] as a condition of the asset sale is [ ] irrelevant. [The new entity] shares the attorney-client privilege of its prepetition predecessor, [the debtor], and, consequently, is [the law firm's] former client." *In re I Successor Corp.*, 321 B.R. at 652.

The facts of *I Successor* are extremely similar to this case. In that case, the debtor was substantially liquidated; however, the unsecured creditors committee retained the right to pursue

the debtor's preference, fraudulent conveyance, and post-petition transfer claims.  The unsecured

creditors' committee then brought suit against a corporate entity and its principals; those

principals had also been principals of the debtor and were alleged to have breached their

fiduciary duties and entered into multiple transactions for the benefit of those principals to the

detriment of the debtor.  The unsecured creditors' committee then moved to disqualify the law

firm that was representing the defendant-principals in the adversary proceeding because the law

firm had previously represented the debtor regarding transactions that were now at issue in the

adversary proceeding.  The Court in *I Successor* rejected the argument that the debtor and the

plaintiff were not the same former client, emphasizing that, just as the attorney-client privilege

passes to a Chapter 7 bankruptcy trustee, so too does the attorney-client privilege pass to post-

petition managers in a Chapter 11.  *Id.* (citing *Commodity Futures Trading Comm'n v.*

*Weintraub*, 471 U.S. 343 (1986)).  Significantly, the *I Successor* court held, "the attorney-client

privilege of [the debtor] passed to the post-petition managers, acting in their roles on behalf of

the debtor when control of [the debtor] passed to them.  [The debtor] has not yet died, and the

fact that the debtor continues to exist solely to pursue lawsuits to collect assets to pay liabilities

is irrelevant." *Id.*

Other courts of this Circuit have used a similar analysis.  See *In re Flag Telecom*

*Holdings, Ltd.*, 2009 WL 5245734, at *9 (S.D.N.Y. Jan. 14, 2009) (finding that the litigation

trustee, and not the new entity that purchased the assets of the bankrupt corporation, held the

attorney-client privilege, a key tool that would enable it to bring suit against the former officers

and directors of the bankrupt corporation); *cf. Tekni-Plex, Inc. v. Meyner & Landis*, 89 N.Y.2d

123, 134 (1996) ("As a practical matter, then, old [entity] did not die.  To the contrary, the

business operations of [the old entity] continued under the new managers.  Consequently, control

of the attorney-client privilege with respect to any confidential communications between [the law firm] and corporate actors of [the old entity] passed to the management of [the new entity].  An attorney-client relationship between [the law firm] and [the new entity] necessarily exists.") (internal citations omitted).  Treating the entity that now holds a debtor's attorney-client privilege after a transfer of assets—whether liquidating trustee or new entity—as the former client of the firm accords with the principle articulated in *Weintraub* that the attorney-client privilege should be held by the entity that "plays the role most closely analogous to that of a solvent corporation's management."  *Weintraub*, 471 U.S. at 353.

LTRB disagrees with this analysis, relying heavily on *Alan N. Halperin, as Liquidating Trustee of the High Ridge Brands Co. Liquidating Trust v. Arawak IX, L.P., et al., (In re HRB Windown Inc., et. al.)*, 2023 WL 3294623 (Bankr. D. Del. May 5, 2023) (cited in Letter dated June 15, 2023 [ECF No. 38, Adv. Pro. No. 22-07059]).  In *HRB Windown*, a law firm represented a private equity fund that purchased the debtor and then represented the debtor as special counsel in its bankruptcy proceedings.  *HRB Windown*, 2023 WL 3294623, at *1-*2. During the course of the bankruptcy, the debtor confirmed a plan of reorganization that provided for the creation of a liquidating trust, the appointment of a trustee for the liquidating trust, and for further appointment of a plan administrator to manage assets that had not been transferred to the Trust.  *Id.* at *2.  The trustee, on behalf of the liquidating Trust, then commenced an adversary proceeding against the private equity firm, who retained as their counsel the same law firm that had represented the debtor as special counsel.  *Id.*  The trustee then moved to disqualify the law firm.  *Id.*  The Delaware Court denied the motion, finding that the plan administrator, not the trustee, was the former client of the law firm.  *Id.* at *4-*5.  The Court noted that the plan

18

stated that "the [d]ebtors shall continue in existence pursuant to the terms of the [p]lan" while

corporate governance activities were to be handled by the plan administrator.  *Id.*

But the *HRB Window* case is distinguishable for several reasons.  Unlike the plan in

*HRB Window,* the Plan here does not provide for the continued existence of the Debtors, there

is no plan administrator, and the Plan does not designate an entity other than the Trustee to

continue going forward.  Indeed, the Debtors' only asset here was sold as part of the Plan.  *See*

Plan, Schedules A/B [ECF No. 18, 19, Case No. 20-23288] (stating that 159 Broadway's only

asset is 100% interest in WB Bridge; in turn, WB Bridge's only asset was the real property

improvements located at 159 Broadway, Brooklyn).  Thus, the effective date of the Plan

rendered the Debtors non-existent, with no one but the Trustee having the power to act on behalf

of the Debtors.[9]  Thus, there is continuity here between the Chapter 11 estate and the Trustee.

*Cf. Waldschmidt v. Compcare Health Services Ins. Corp. (In re Peck Foods)*, 196 B.R. 434, 439

(Bankr. E.D. Wis. 1996) ("[B]oth the debtor in possession and the [C]hapter 7 trustee are

fiduciaries for creditors in existence at the [C]hapter 11 filing . . . '[I]f a debtor remains in

possession . . . the debtor's directors bear essentially the same fiduciary obligation to creditors

and shareholders as would the trustee for a debtor out of possession.'") (quoting *Weintraub*, 471

U.S. at 355).

There is also a significant difference in the circumstances of the representation here

compared with *HRB Window*.  In *HRB Window*, the law firm represented the private equity

---

[9]      The Plan does include a provision that "[o]n and after the Effective Date, each of the Post-Confirmation
Debtors may conduct its financial affairs and may use, acquire, and dispose of property free of any restrictions of the
Bankruptcy Code, the Bankruptcy Rules and the Bankruptcy Court, except as otherwise provided in this Plan or in
the Confirmation Order."  Plan ¶ 9.4.  This statement appears in a section entitled "Revesting of Assets" that
provides that property other than the causes of action related to the Property would revest in the Debtors.  However,
it does not appear that there were any remaining assets to revest in the Debtors and that the Debtors therefore have
no assets or ongoing business.  *See, e.g.*, Plan ¶ 5.1 (providing for the rejection of all leases); Plan ¶ 6.1(c) (requiring
the Debtors to hand over all cash on hand to the disbursing agents); Plan ¶ 6.6 (providing for the transfer of the
Debtors' books and records to the purchaser of the property).

fund first, and only later undertook to represent the debtor after both clients explicitly agreed to waive any conflict that might arise during the joint representation. 2023 WL 3294623, at *1-*2. By contrast, LTRB represented the Debtors first, which resulted in LTRB first owing a duty of loyalty to the Debtors, and the Trustee explicitly declined to waive any conflict. *See* Disqualification Motion ¶ 28; Disqualification Reply ¶ 8; *see also Kohut v. Lenaway (In re Lennys Copy Ctr. & More LLC)*, 515 B.R. 562, 567 (Bankr. E.D. Mich. 2014) (The "first client's rights to loyalty takes precedence over the second client's individual preference for a particular counsel.") (internal citations omitted).

LTRB also cites *In re Abengoa Bioenergy Biomass of Kansas*, *LLC*, 2018 WL 1321951 (Bankr. D. Kan. Mar. 13, 2018) and *In re Las Uvas Valley Dairies*, 648 B.R. 260, 265 (Bankr. D.N.M. 2022), *reconsideration denied*, 649 B.R. 53 (Bankr. D.N.M. 2023), to support its assertion that a liquidating trust is a different entity than a debtor. *See Abengoa*, 2018 WL 1321951, at *8; *Las Uvas*, 648 B.R. at 265. As cases outside the Second Circuit, these cases are not binding on this Court and, in fact, the court in *Abengoa* expressly rejected reliance on the *I Successor* case from the Southern District of New York. *See Abengoa*, 2018 WL 1321951, at *7 (noting that *I Successor* applies New York's disqualification rules and thus the court is not bound to follow it in applying Kansas Rules of Professional Conduct); *Las Uvas¸* 648 B.R. at 264-65 (following *Abengoa)*. Moreover, the *Abengoa* case is factually distinguishable. It involved multiple debtors in cases from different jurisdictions, all of whom had consented to joint representation and information sharing, and the motion to disqualify was brought on the eve of trial, apparently to gain a tactical advantage. *Abengoa,* 2018 WL 1321951, at *7 (finding facts

there to be distinguishable from *I Successor Corp*., which "didn't involve intercompany claims between separate Chapter 11 debtors").[10]

> 2. Whether there is a Substantial Relationship between the Prior Representation and the New Matter

As for the second prong of substantial relationship, the Court starts by reviewing the obligations of a debtor in bankruptcy and its counsel.

A debtor in possession owes a fiduciary duty to the estate and the debtor's creditors. *In re Sillerman,* 605 B.R. 631, 640 (Bankr. S.D.N.Y. 2019); *see also In re Klaynberg*, 643 B.R. 309, 317 (Bankr. S.D.N.Y. 2022) ("[A] debtor in possession owes fiduciary duties to the bankruptcy estate and must, among other things, protect and . . . conserve property in [its] possession for the benefit of creditors and refrain[ ] from acting in a manner which could damage the estate, or hinder a successful reorganization of the business.") (internal citations and quotations omitted). "In nonlegal terms, directors and management of a [C]hapter 11 debtor are obligated to preserve the assets of the debtor and otherwise act consistently with the interests of *both* creditors and shareholders." 1 Collier Trustees & Debtors in Possession ¶ 20.05 (2023) (emphasis in original). Officers and directors of a debtor in possession are bound by a duty of loyalty, which encompasses "an obligation to refrain from self-dealing, to avoid conflicts of interests and the appearance of impropriety and to treat all parties to the case fairly." 7 Collier on Bankruptcy ¶ 1108.09 (16th ed. 2023). "Indeed, the willingness of courts to leave debtors in possession 'is premised upon an assurance that the officers and managing employees can be

---

[10]     The Court in *Abengoa* explained that "where the attorney's representation was of two, commonly interested clients, one of whom is now complaining[,] the substantial relationship test is inapposite because one client couldn't reasonably expect confidences imparted during the course of the joint representation to be withheld from the other client." *Abengoa*, 2018 WL 1321951, at *8 (noting that attorney jointly represented the two debtors) (internal citations and quotations omitted); *id.* at *9 (noting that engagement letters provided that none of the information supplied by one of the debtors would be deemed confidential as against the other companies).

depended upon to carry out the fiduciary responsibilities of a trustee.'" *Weintraub*, 471 U.S. at 355–56 (quoting *Wolf v. Weinstein*, 372 U.S. 633, 651 (1963)).

Consistent with these obligations, counsel to a debtor in possession must "carefully balance not only obligations to the client, but also the additional fiduciary and ethical obligations imposed by the bankruptcy courts in the context of a bankruptcy case." 1 Collier on Bankruptcy § 8.01 (16th ed. 2023). "Courts have held that, as part of this fiduciary duty, a lawyer must make inquiries and take action to [educate] and remind the client of the client's own duties in the bankruptcy case." John G. Lounghnane & Maria Pevzner, *Ethics: Who Exactly is Your Client, How Do You Get Paid (and by Whom), and How Do You Avoid Getting Into Trouble When the Client Tells You to Do Something That Makes You Feel a Little Queasy*, 071405 American Bankruptcy Institute 227 (2015). "[P]rofessionals employed by the debtor in possession are expected to represent the interests of the bankruptcy or [C]hapter 11 'estate' rather than a single party." 1 Collier on Bankruptcy § 8.01 (16th ed. 2023). In representing these Debtors in possession then, LTRB's representation included all aspects of the Debtors' bankruptcy cases. *See* Robinson Brog Retention Application ¶ 11; LTRB Retention Application ¶ 11; Ringel Decl. ¶ 3 (noting that Debtors sought to retain Robinson Brog as its "general and corporate counsel to . . . assist it in carrying out its duties as a debtor in possession under Chapter 11 of the Bankruptcy Code.").

Of particular note here, LTRB's duties included completing the Debtors' schedules of assets and liabilities, as well as the SOFAs. *See* 11 U.S.C. § 521(a). The accuracy of these documents is vital to a bankruptcy proceeding because they

> provide a recent financial history of the debtor as well as a list of its assets, liabilities and contractual obligations. **These forms are the debtor's representations of its own financial condition at the start of the case. They are signed under penalty of perjury. They are critically important and must be accurate, since the information**

**will be relied upon by all parties and form the basis for discussions regarding a plan.**

1 Collier Trustees & Debtors in Possession ¶ 20.05 (2023) (emphasis in original).  A debtor's SOFA requires a debtor to list, among other things, payments or transfers of property made within one year before filing the bankruptcy case that benefitted any insider and transfers of property made by the debtor or a person acting on behalf of the debtor within two years of filing the bankruptcy.  *See* Official Bankruptcy Form 207.  And in fact, Robinson Brog did prepare and file these documents.  *See, e.g.,* Final Application of Robinson Brog Leinwand Greene Genovese & Gluck P.C. as Attorneys for the Debtors for an Award of Compensation for Professional Services Rendered and Reimbursement of Actual and Necessary Expenses Incurred [ECF No. 135, Case No. 20-23288] (showing time records that indicate at least ten hours' work by multiple staff related to the Debtors' schedules); *see also* 159 Broadway SOFA (listing payments to insiders).

Turning now to the LTRB's proposed new representation, LTRB seeks to defend its new clients against allegations about the receipt of prepetition transfers from the Debtors.  More specifically, the Complaint here seeks to recover a total of $7,189,600 in prepetition transfers that were alleged to have been fraudulently conveyed, the majority of which were made within two years of the filing date of the Debtors' bankruptcy petition.  *See generally* Complaint.  In seeking such relief, the Adversary Proceeding directly addresses the prepetition financial activity of the Debtors, which LTRB was required to assess when completing the SOFA and schedules.  Thus, litigation over these prepetition transfers clearly has a substantial overlap with LTRB's work in preparing the Debtors' schedules and SOFAs, as that work entailed an analysis of Debtors' assets and transfers of property within two years of the bankruptcy filing.  Said another way, LTRB as Debtors' counsel was required to undertake "essentially the same" analysis as it

would be required to perform in defending its new clients in the Adversary Proceeding, only this time representing the opposing side. *Ladak,* 2013 WL 3810188, at *3 (quoting *Bank of America, N.A. v. Klein*, 2011 WL 63910, at *4 (D. Conn. 2011); *see also Watkins v. Trans Union, LLC*, 869 F.3d 514, 520 (7th Cir. 2017) (matters "may still be substantially related if there is a substantial risk that confidential information would materially advance the client's position in the present matter").

In reaching the conclusion that there is substantial overlap here, the Court finds the analysis in *In re MarketXT Holdings Corp.*, 2005 WL 3789407, to be particularly instructive. In that case, several of the debtor's creditors filed an involuntary Chapter 7 petition but the case was voluntarily converted to a Chapter 11 case. *Id.* at *2. The operating trustee that was appointed filed an adversary proceeding to recover funds from a series of transactions as actual and constructive fraudulent conveyances. *Id.* Against this backdrop, the trustee moved to disqualify the law firm that sought to represent the defendants in the adversary proceeding, alleging that an impermissible conflict had arisen because that firm had also represented the debtor before the bankruptcy regarding the transactions at issue in the adversary proceeding. *Id.* at *1-*3. The court in *MarketXT* granted the trustee's motion to disqualify the law firm from representing the defendants in the adversary proceeding, finding "an identity of issues" between the former representation and the adversary proceeding—namely, that the law firm had access to confidential information by virtue of its access to the debtor's books and records and interview of the Debtor's principals, in-house and outside counsel, and at least one employee. *Id.* at *5-*6; *see also In re Lennys Copy Ctr.*, 515 B.R. at 566 (finding that an adversary proceeding brought to recover fraudulent conveyances was "substantially related" to representation of the debtor).

LTRB argues that it did not discuss pre-petition transfers with the Debtors.  *See* Hr'g Tr. 32:16-24 (March 23, 2023).[11]  But this does not change the result.  As another court succinctly stated, "[a]lthough [C]hapter 11 counsel did not perform a preference analysis while representing [the Debtor], he could have.  In fact, he should have, as [ ] [a] debtor in possession . . . [is] responsible for recovery of preferences, and the assistance of counsel is vital in assisting the debtor or trustee in performing this duty." *Peck*, 196 B.R. at 439 (concluding that it is irrelevant that the attorney did not actually examine possible preferences).  Indeed, the UST is right in identifying this argument as problematic in potentially allowing a law firm to benefit from a failure to carry out its duties as debtor's counsel.  *See* UST Letter at 3-4 (arguing that if LTRB had no communications with the Debtors concerning prepetition transfers, "the firm would be admitting that it failed to provide advice and counsel to the Debtors to fulfill its duties and obligations under the Bankruptcy Code and Rules, which require the filing of Statements of Financial Affairs (SOFAs).").  Condoning such a position might incentivize a law firm to avoid certain duties as debtor's counsel as a way to open the door to the law firm's later representation of a debtor's principals in litigation.[12]

In a similar argument, LTRB selectively characterizes its obligations as Debtors' counsel to argue that its representation of the Debtors is not substantially related to the Adversary

---

[11]    At the hearing, counsel from LTRB explained:

[t]hese issues of, you know, what's potentially recoverable transfers might be out there, was not an issue that anyone looked at or anyone was focused on during the entire case, except, maybe the Creditors' Committee, which is the predecessor to the Creditors' Trust, may have looked at it, but from the debtors' standpoint, it was so far down on the list of things that had to get done in this case for it to be successful, that it never reached the point of getting anyone's attention in the case.

*Id.*

[12]    Moreover, there is reason to disagree with LTRB's stance for another reason:  the record indicates that it did engage in at least some analysis of pre-petition transfers.  The 159 Broadway SOFA lists two pre-petition transfers to insiders within a year of the petition.  *See* 159 Broadway SOFA.  Further, the Debtor was prompted to engage in additional analysis of pre-petition transfers when counsel for the Official Committee of Unsecured Creditors requested additional information about pre-petition transfers.  *See* Hr'g Tr. 41:7-19 (March 23, 2023).

Proceeding.  *See* Disqualification Opp. ¶ 22-23 ("The central issue in the [C]hapter 11 case

concerned the Debtors' effort to obtain financing or a joint venture partner to complete the

construction of a hotel during the pandemic . . .  [i]n contrast, the fraudulent transfer claims have

no relationship to Robinson Brog and then [LTRB]'s efforts to obtain the necessary financing to

complete the project . . . [N]either [LTRB] nor Robinson Brog had any involvement in anything

related to the fraudulent transfer claims asserted by the Trustee when they were counsel to the

Debtors.").  In supports of its position, LTRB relies on *In re Mack Indus., Ltd.*, 606 B.R. 313 and

*In re Allboro Waterproofing Corp.*, 224 B.R. 286.  But once again, the Court disagrees.

        In the *Mack* case, the court declined to disqualify an attorney from representing

defendants in an adversary proceeding when the attorney also had represented the debtors,

holding that the new representation would be permissible so long as the attorney withdrew from

representing the debtor.  *See generally, Mack*, 606 B.R. 313.  In reaching that conclusion, the

*Mack* court found that the attorney "had no involvement in anything relating to preference claims

or the types of non-insider fraudulent transfer claims asserted by the trustee when he was counsel

for Mack for a few days when it was a [C]hapter 11 debtor in possession." *Id.* at 324.   But the

*Mack* case is distinguishable on its unusual facts.  The debtor in *Mack* was a debtor in possession

for less than a month—and counsel represented the debtor as a debtor in possession for less than

a week—before a secured creditor successfully moved for the appointment of a Chapter 11

trustee.  *Id.* at 317.  As a result, the debtor's counsel essentially had no time to perform its duties

for the debtor in possession in Chapter 11.  The facts here are starkly different, with LTRB

representing the Debtors in possession for nearly two years from the filing of these cases through

confirmation.

The case of *In re Allboro Waterproofing Corp*. is also distinguishable.  *Allboro* was a Chapter 7 case where the debtor never acted as a debtor in possession.  In representing the Chapter 7 debtor, the firm's representation of the debtor was more "limited" than acting as debtor's counsel in Chapter 11.  *See Allboro*, 224 B.R. at 289, 294.  Generally, a Chapter 7 debtor's only obligations are to provide records and cooperate with the Chapter 7 trustee; a Chapter 7 debtor's counsel has no statutory duties to the estate and only has a duty to their client as described in Rules of Professional Conduct.  *See Mack*, 606 B.R. at 318-19.  By contrast, a Chapter 11 debtor owes a fiduciary duty to the estate.  *Id.* at 320.[13]  Thus, both the *Mack* and *Allboro* cases involved counsel who were confronted with far different circumstances and obligations than the counsel in this case.  *See Allboro*, 224 B.R. at 294 (noting that a motion to disqualify requires a court to conduct a "painstaking analysis of the facts.") (internal citations omitted).

3.   Whether the Attorney Whose Disqualification is Sought had or
was Likely to have had Access to Confidential Information

Having found that there is a substantial relationship between the two matters being handled by LTRB, the Court does not need to determine "whether the lawyer did, in fact, receive confidential information."  *Hull*, 513 F.2d at 572 (internal citations and quotations omitted).  "Rather, where it can reasonably be said that in the course of the former representation the attorney might have acquired information related to the subject matter of his subsequent representation, it is the court's duty to order the attorney disqualified.  The breach of confidence

---

[13]     Some courts have reached a different conclusion than *Mack* and *Allboro* about the substantial relationship question for counsel representing a Chapter 7 debtor, holding that such a lawyer cannot also represent a defendant in an adversary proceeding brought by the Chapter 7 trustee on behalf of the debtor's estate.  *See, e.g., Houghton v. Morey (In re Morey)*, 416 B.R. 364 (Bankr. D. Mass. 2009).  The Court does not need to address the split of authority on this question.

[does] not have to be proved; it is presumed in order to preserve the spirit of the Code." *Id.* (internal citations and quotations omitted); *accord Felix*, 49 F. Supp. 2d at 268.

LTRB again relies on *Mack,* which found that it was "hard to conceive of any confidential information that could potentially be relevant to the trustee's claims against the adversary defendants" and that the trustee had not met its burden to specify the confidential information to which the former firm may have had access. *Mack*, 606 B.R. at 325. But once again, the *Mack* decision must be understood on its unique facts, where counsel represented the debtor in possession for less than a week before a Chapter 11 trustee administered the case. In any event, *Mack* is inconsistent with the weight of authority, including binding authority in this Circuit. As the Second Circuit has clearly instructed, "a court should not require proof that an attorney actually had access to or received privileged information while representing the client in a prior case. Such a requirement would put the former client to the Hobson's choice of either having to disclose his privileged information in order to disqualify his former attorney or having to refrain from the disqualification motion altogether." *Cook Indus.*, 569 F.2d at 740; *accord U.S. Football League*, 605 F. Supp. at 1461 (holding that a finding of a substantial relationship between the former and current representation creates a presumption that the former client of the challenged firm imparted to the firm confidential information relevant to the present suit). Indeed, courts have admonished that "[l]awyers should not put themselves in the position 'where, even unconsciously, they might take, in the interests of a new client, an advantage derived or traceable to, confidences reposed under the cloak of a prior, privileged relationship.'" *DeFazio v. Wallis*, 459 F. Supp. 2d 159, 165 (E.D.N.Y. 2006) (quoting *T. C. Theatre Corp*, 113 F. Supp. at 269). Thus, "whether or not actual confidential information was shared with [the law firm] is irrelevant; the issue is whether [the law firm] 'could have' obtained such

28

information." *Peck*, 196 B.R. at 440 (citing *Burkes v. Hales*, 165 Wis. 2d 585, 592, n.5 (Ct. App. 1991)).

LTRB also relies upon the idea that any information concerning the allegedly fraudulent conveyances would be discoverable by the Trustee.   Disqualification Opp. ¶¶ 24-25.   "[A]s a general rule, however, the attorney-client privilege 'is not nullified by the fact that the circumstances to be disclosed are part of a public record, or that there are other available sources for such information . . . .'" *Tiuman v. Canant*, 1994 WL 198690, at *3 (S.D.N.Y. May 19, 1994) (quoting *Emle Indus., Inc. v. Patentex, Inc.*, 478 F.2d 562, 572–73 (2d Cir. 1973)); *see also Gov't of India v. Cook Indus., Inc*., 422 F. Supp. 1057, 1060 (S.D.N.Y. 1976), *aff'd*, 569 F.2d 737 (2d Cir. 1978) ("Furthermore, if a substantial relationship is established, the presumption of access to confidences prevails even though the 'confidential' information may be publicly available").

Finally, when determining whether LTRB should be subject to disqualification, the Court considers whether the Disqualification Motion was interposed for any tactical advantage.  The Court concludes it was not.  This case is in its infancy.  The Trustee raised his concerns about LTRB's disqualification as soon as possible.  Given that discovery has not yet begun in this matter, the Adversary Defendants would suffer minimal prejudice if required to find new counsel.  *Cf. Sauer v. Xerox Corp*., 85 F. Supp. 2d 198, 201 (W.D.N.Y. 2000) (motion to disqualify denied where litigation was already in advanced stages and disqualification would cause significant hardship).

C.    Risk of Trial Taint

Having found that the three part test for disqualification has been met, the Court turns to the issue of trial taint.  Disqualification is only warranted when there is a "significant risk of trial

29

taint." *Bell*, 2004 US Dist. LEXIS 14343 at *4; *see also Nyquist,* 590 F.2d at 1246.  Risk of trial

taint can arise "(1) 'where an attorney's conflict of interests in violation of Canons 5 and 9 . . .

undermines the court's confidence in the vigor of the attorney's representation of his client,' or

(2) 'where the attorney is at least potentially in a position to use privileged information

concerning the other side through prior representation, for example, in violation of Canons 4 and

9.'" *Bulkmatic Transp. Co. v. Pappas*, 2001 WL 504841, at *2 (S.D.N.Y. May 11, 2001)

(quoting *Nyquist*, 590 F.2d at 1246).

When considering whether a risk of trial taint is present, the Court is mindful of the

special obligations of a debtor in possession, and by extension, its counsel, which create a need

for increased vigilance against conflicts of interest.  1 Collier on Bankruptcy § 8.03 (16th ed.

2023) ("Conflict-of-interest rules are more strictly applied in the bankruptcy context than in

other areas of the law, at least insofar as they relate to professionals retained by the estate.").

There are strong policy reasons behind such an approach:

> There are two general reasons for this strict application [of the conflict of interest rules]
> in the bankruptcy context: to maintain the integrity of the bankruptcy process and to
> assure that counsel devote undivided loyalty to the client.  In addition, and more
> specifically, the complexity of party relationships, capacities and representations in the
> bankruptcy context creates the reason for stricter application of the rules.  Concepts of
> consent and waiver become difficult to apply when the attorney representing a debtor in
> possession also has an interest in the estate, while the debtor in possession is acting as a
> fiduciary for another group, the creditor body . . . The competing interests, the
> multiplicity of parties and the diversity of interests present in bankruptcy cases create
> more numerous conflicts (actual as well as potential) than are found in other areas of
> litigation.  Further, bankruptcy often involves shifting relationships and loyalties, which
> make it difficult to identify whether an actual conflict exists or there is the potential for
> one to arise during the case.

*Id.*

When considering trial taint in the context of subsequent representation of a party adverse

to a lawyer's first client, it is particularly relevant whether an attorney had access to confidential

information concerning the first client.  *See Wai Hoe Liew v. Cohen & Slamowitz, LLP*, 2015

WL 5579876, at *8 (E.D.N.Y. Sept. 22, 2015) ("The guiding principle for determining whether

an attorney formerly represented a client in a matter for the purposes of disqualification is

whether the attorney was in a position to learn the confidences of former clients.") (internal

citations and quotations omitted).  The issue of access to confidential information "concerns

itself as much with the lawyer's *use* of confidential information in a manner adverse to the

interests of the former client that trusted the lawyer with its confidences."  *Ullrich v. Hearst

Corp.*, 809 F. Supp. 229, 235–36 (S.D.N.Y. 1992) (internal citation omitted) (emphasis in

original).  "Adverse use of confidential information is not limited to disclosure.  It includes

knowing what to ask for in discovery, which witnesses to seek to depose, what questions to ask

them, what lines of attack to abandon and what lines to pursue, what settlements to accept and

what offers to reject, and innumerable other uses.  The rule concerns itself with the unfair

advantage that a lawyer can take of his former client in using adversely to that client information

communicated in confidence in the course of the representation."  *Id.*

 LTRB's representation of the Debtors provided exactly the type of access that warrants

disqualifying LTRB from representing a party adverse to the Debtors.  LTRB's representation of

the Debtors required an understanding of the Debtors' finances and an analysis of pre-petition

transfers, particularly transfers to purported insiders such as Mr. Hager.[14]  To now allow LTRB

to represent an adverse party in a matter involving those exact same transfers would give the

---

[14]  While LTRB contends that Mr. Hager is not an equity owner of the Debtors, *see* Hr'g Tr. 63:5-8 (March 23, 2023), LTRB does not dispute that Mr. Hager is a person in control of the Debtors.  *See* 159 Broadway SOFA (identifying Mr. Hager as the manager of the Debtors); *see also* 11 U.S.C. §101(31)(B)(3) (defining "insiders" as officers of a corporate debtor).  Notably, LTRB has not identified any party other than Mr. Hager who exercises control of the Debtors.

Adversary Defendants in the Adversary Proceeding the precise type of advantage that Rule 1.9 is designed to avoid.

LTRB's potential representation of a party adverse to the Debtors is particularly concerning given LTRB's representations about its "disinterestedness" in these bankruptcy cases. Section 327(a) provides that a trustee "may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title." 11 U.S.C. § 327(a). In seeking retention as counsel for the Debtors, the law firm represented itself as "disinterested," stating that "Robinson Brog has no connection with the Debtors (except for as stated herein), their creditors, any other party in interest, their respective attorneys and accountants, the United States Trustee, or any person employed in the office of the United States Trustee . . . . " Ringel Decl. ¶ 7. Notable for today's purposes, the law firm went further in categorically representing that it would "not, at any time, represent any other entity in connection with these cases." *Id.* It is hard to square this representation with what LTRB now seeks to do.

In reaching its decision today, the Court in mindful that the rules against representation of a party adverse to a former client "ensures that a prior client will not be cut loose from its legal counsel simply because a more lucrative client comes along with a claim against it." *In re Wingspread Corp.*, 152 B.R. 861, 864 (Bankr. S.D.N.Y. 1993). Indeed, Rule 1.9 is also known as the "side switching rule" to prevent exactly that outcome. *See Wai Hoe Liew*, 2015 WL 5579876, at *7. Allowing a law firm representing a Chapter 11 debtor to later represent individuals who managed the debtor creates an incentive for a firm to "play[ ] fast and loose with its clients [ ]or turn [ ] a blind eye to potential conflicts." *Wingspread Corp.*, 152 B.R. at 864;

see *In re Freedom Solar Ctr., Inc.*, 776 F.2d 14, 18 (1st Cir. 1985) ("Federal law imposes duties

on the debtor.  In a given case these duties can become onerous and complicated, necessitating

truly independent counsel.").

In sum, LTRB's access to the Debtors confidential information and questions regarding

LTRB's allegiance give rise to a significant risk of trial taint.  In this instance, disqualification is

"a necessary and desirable remedy . . . to enforce the lawyer's duty of absolute fidelity and to

guard against the danger of inadvertent use of confidential information . . . ." *Hull*, 513 F.2d at

571 (quoting *Ceramco, Inc. v. Lee Pharmaceuticals*, 510 F.2d 268, 271 (2d Cir. 1975)).

**CONCLUSION**

For the reasons set forth above, both the Withdrawal Motion and the Disqualification

Motion are granted.  The Trustee is directed to settle an order on five days' notice.  The proposed

order must be submitted by filing a notice of the proposed order on the Case

Management/Electronic Case Filing docket, with a copy of the proposed order attached as an

exhibit to the notice.  A copy of the notice and proposed order shall also be served upon

opposing counsel and the UST.

Dated: White Plains, New York
       February 5, 2024

_____*/s/ Sean H. Lane*_____ _____
UNITED STATES BANKRUPTCY JUDGE